UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X   Civil Action No.

ALEXANDRA GAVRILOVA and ANNEMARIE
WOODING *on behalf of themselves and all others
similarly situated,*

                        Plaintiffs,

               -against-

OTG MANAGEMENT, LLC, OTG JFK T5 VENTURE,
LLC, and WORKERS UNITED, LAUNDRY,
DISTRIBUTION, AND FOOD SERVICE JOINT
BOARD, SEIU,

                      Defendants.
--------------------------------------------------------------------X

**CLASS AND COLLECTIVE
ACTION COMPLAINT**


**JURY TRIAL DEMANDED**

Plaintiffs ALEXANDRA GAVRILOVA and ANNEMARIE WOODING (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, Bell Law Group, LLC, respectfully allege on as follows:

## PRELIMINARY STATEMENT

1. This action is brought by Plaintiffs Alexandra Gavrilova and Annemarie Wooding, longtime bartenders at John F. Kennedy International Airport, on behalf of themselves and similarly situated tipped employees employed by Defendants OTG Management and OTG JFK T5 Venture, LLC (collectively, "OTG"). For years, OTG systematically paid Plaintiffs and other tipped workers a sub-minimum wage while requiring them to perform extensive non-tipped and off-the-clock work, misappropriating tips, failing to provide legally required wage notices and statements, and maintaining inaccurate time and payroll records. OTG's uniform policies and practices violated the Fair Labor Standards Act and New York Labor Law, depriving Plaintiffs and the putative class of lawfully earned wages and tips.

1

**NATURE OF CASE**

2.        OTG Management, LLC ("OTG Management" or "Defendant OTG") is a privately-owned company that owns and operates hundreds of restaurants, bars, and retail stores in airport terminals across North America, including John F. Kennedy International Airport in Queens, New York ("JFK"). Upon information and belief, OTG JFK T5 VENTURE, LLC ("OTG JFK" or "Defendant OTG JFK") (collectively, the "OTG Defendants") is a subsidiary of OTG Management, which operates OTG's Terminal 5 at JFK.

3.        OTG prides itself on being a "people-first culture built by Crewmembers who show up every day with care, hospitality, and teamwork at the center of everything they do," and claims to be "focused on creating an environment where people can thrive."[1] "Since its debut in 2008, the OTG-JFK Experience at JetBlue's Terminal 5 has set a new standard for airport hospitality."[2] The New York Times has highlighted OTG's "revolutionary dining and retail program, the first of its kind in the U.S."[3] Further, "Airport Revenue News reports OTG T5 consistently leads in revenue per departing passenger among the top 50 U.S. airports, and Frommer's ranks its dining among the top ten globally."[4]

4.        Plaintiffs are employed as Tipped Workers[5] (bartenders) at restaurants and bars owned and operated by the OTG Defendants in JFK. However, the OTG Defendants failed to: i) pay Plaintiffs the proper minimum wage rate for all hours worked; ii) pay Plaintiffs for all hours worked; iii) pay Plaintiffs the entirety of their tips earned; iv) and provide accurate wage notice and wage

---

[1] OTG, https://www.otgexp.com/careers-benefits (last visited January 23, 2026).
[2] OTG, https://www.otgexp.com/experience_locations/john-f-kennedy-airport/ (last visited January 23, 2026).
[3] Id.
[4] Id.
[5] "Tipped Workers" include current and former tipped employees, including, but not limited to, bartenders and servers of OTG Management, who were employed at restaurants and bars owned, operated, and/or controlled by OTG Management in JFK for the relevant time period covered in this action and as defined in Paragraph 187 of this Complaint.

statements to Plaintiffs.

5.      This lawsuit seeks to recover minimum wages, misappropriated tips, and statutory penalties for Plaintiffs and other similarly situated Tipped Workers who have worked at the OTG Defendants' restaurants and bars at JFK.

6.      Plaintiffs now bring this action on behalf of themselves and all others similarly situated for Defendants' systemic and continuous violations of: i) the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA"); ii) New York Labor Law Article 19 §§ 190 *et seq*. ("NYLL"); iii) NYLL Article 19 §§ 650 *et seq*.; iv) the Labor Management Relations Act, 29 U.S.C. § 185 *et seq*. ("LMRA"); v) the New York State Human Rights Law (NYS Executive Law § 296 *et seq*. ("NYSHRL"); vi) the New York City Human Rights Law, New York City Administrative Code § 8-107 *et seq*. ("NYCHRL"); and vii) any other cause(s) of action that can be inferred from the facts set forth herein.

7.      Additionally, Plaintiffs now bring this action on behalf of themselves and all similarly situated employees, pursuant to the FLSA, 29 U.S.C. §§ 201 et seq., and specifically the collective action provision of the FLSA, 29 U.S.C. § 216(b), to remedy Defendants' violations of the wage and hour provisions of the FLSA, as such violations have deprived Plaintiffs and others similarly situated of their lawfully-earned wages.

8.      Plaintiffs also bring this action on behalf of themselves and a class of similarly situated current and former employees of Defendants, pursuant to Fed. R. Civ. P. 23, for violations of New York Labor Law ("NYLL") Article 6 §§ 190, *et seq*., and Article 19, §§ 650, *et seq*., and the supporting New York State Department of Labor Regulations.

9.      Plaintiffs also complain, pursuant to the Labor Relations Management Act, 29 U.S.C. § 185, *et seq*., against Defendants OTG JFK and WORKERS UNITED, LAUNDRY,

DISTRIBUTION, AND FOOD SERVICE JOINT BOARD, SEIU ("Defendant WORKERS UNITED"), as Plaintiffs assert that Defendant OTG JFK violated and breached the collective bargaining agreement when it wrongfully terminated Plaintiffs' seniority. Plaintiff further alleges that Defendant WORKERS UNITED breached its obligation and duty of fair representation – in that it arbitrarily ignored and failed to process Plaintiff Gavrilova's meritorious grievance regarding the loss of her and other workers' seniority, directly resulting in the loss of Plaintiff Gavrilova's and other similarly situated workers' jobs.

## JURISDICTION AND VENUE

10. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* and the Labor Management Relations Act, 29 U.S.C. § 185, *et seq*.

11. This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12. Venue is proper in this District because Defendants conduct business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## DEMAND FOR JURY TRIAL

13. A jury trial is requested on all claims alleged herein.

## THE PARTIES

14. Plaintiff Alexandra Gavrilova ("Ms. Gavrilova") was and still is a resident of Queens County, in the State of New York.

15. Plaintiff Annemarie Wooding ("Ms. Wooding") was and still is a resident of

Queens County, in the State of New York.

16.     Plaintiffs are both covered employees within the meaning of the FLSA, 29 U.S.C. § 201, et seq. and NYLL, N.Y. Lab. Law § 160 et seq.

***OTG Management, LLC***

17.     OTG Management employed Plaintiffs as tipped bartenders and other tipped workers at all relevant times.

18.     At all relevant times, OTG Management employed more than two persons and have been, and continue to be, employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Notably, Plaintiffs' work took place in bars and/or restaurants owned and operated by OTG Management within John F. Kennedy International Airport in Queens, New York.

19.     OTG Management maintains offices at 352 Park Avenue South, 10th Floor, New York, NY 10010-1726.

20.     OTG Management is a foreign limited liability company existing under the law of the state of Delaware and doing business in the State of New York.

21.     Upon information and belief, during each of the three years preceding the date of this complaint, OTG Management has had gross revenues in excess of $500,000 per year.

22.     At all relevant times, OTG Management was an "enterprise engaged in commerce or in the production of goods for commerce" under FLSA 29 U.S.C. § 203.

23.     At all times hereinafter mentioned, OTG Management exercised control over the terms and conditions of Plaintiffs' employment, in that OTG Management had the power to: (i) hire and fire employees; (ii) determine rates and methods of pay; (iii) determine work schedules; (iv) supervise work and control of the employees, including the Plaintiffs herein; and (v) otherwise affect the quality

of the employees' work conditions and employment.

24.     OTG Management allowed employees to freely transfer between, or be shared by, the various OTG restaurants it operated without retraining such employees.

25.     OTG Management applied the same employment policies, practices, and procedures to all tipped workers at its OTG restaurants and bars, including policies, practices, and procedures with respect to payment of wages, payment of minimum wage compensation, tips, and records of hours, and the provision of wage notices and wage statements.

26.     OTG Management was an "employer" of Plaintiffs within the meaning of the FLSA, 29 USC § 203(d), and NYLL § 190(3).

***OTG JFK T5 VENTURE, LLC***

27.     OTG JFK T5 VENTURE, LLC employed Plaintiffs as tipped bartenders and other tipped workers at all relevant times.

28.     At all relevant times, OTG JFK T5 VENTURE, LLC employed more than two persons and have been, and continue to be, employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Notably, Plaintiffs' work took place in bars and/or restaurants owned and operated by OTG Management within John F. Kennedy International Airport in Queens, New York.

29.     OTG JFK T5 VENTURE, LLC maintains offices at JFK Airport, Terminal 5, Jamaica, NY 11430.

30.     OTG JFK T5 VENTURE, LLC is a foreign limited liability company existing under the law of the state of Delaware and doing business in the State of New York.

31.     Upon information and belief, OTG JFK T5 VENTURE, LLC is a subsidiary of OTG Management that operates bars, restaurants, and concessions at JFK Airport.

32.    Upon information and belief, during each of the three years preceding the date of this complaint, OTG JFK T5 VENTURE, LLC, has had gross revenues in excess of $500,000 per year.

33.    At all relevant times, OTG JFK T5 VENTURE, LLC was an "enterprise engaged in commerce or in the production of goods for commerce" under FLSA 29 U.S.C. § 203.

34.    At all times hereinafter mentioned, OTG JFK T5 VENTURE, LLC exercised control over the terms and conditions of Plaintiffs' employment, in that OTG JFK T5 VENTURE, LLC had the power to: (i) hire and fire employees; (ii) determine rates and methods of pay; (iii) determine work schedules; (iv) supervise work and control of the employees, including the Plaintiffs herein; and (v) otherwise affect the quality of the employees' work conditions and employment.

35.    OTG JFK T5 VENTURE, LLC allowed employees to freely transfer between, or be shared by, the various OTG restaurants it operated without retraining such employees.

36.    OTG JFK T5 VENTURE, LLC applied the same employment policies, practices, and procedures to all tipped workers at its OTG restaurants and bars, including policies, practices, and procedures with respect to payment of wages, payment of minimum wage compensation, tips, records of hours, and the provision of wage notices and wage statements.

37.    Upon information and belief, and at all relevant times, Defendant OTG JFK was a party to a collective bargaining agreement with Defendant WORKERS UNITED, which governed the terms of Plaintiffs' and similarly situated workers' employment with the OTG Defendants.

38.    OTG JFK T5 VENTURE, LLC was an "employer" of Plaintiffs within the meaning of the FLSA, 29 USC § 203(d), and NYLL § 190(3).

***Workers United, Laundry, Distribution, and Food Service Joint Board, SEIU***

39.    Defendant Workers United, Laundry, Distribution, and Food Service Joint Board, SEIU ("Defendant WORKERS UNITED") is a union that represents both private and public sector

workers in the food industry, distribution warehouses, dry cleaners, and industrial laundries. Plaintiffs, FLSA Plaintiffs, and members of the NYLL Class were members while employed by Defendants OTG Management and OTG JFK T5 VENTURE, LLC. Defendant has its principal headquarters at 703 McCarter Highway, Newark, New Jersey 07102.

40.     Upon information and belief, and at all relevant times, Defendant WORKERS UNITED was a party to a collective bargaining agreement with Defendant OTG JFK, which governed the terms of Plaintiffs' and similarly situated workers' employment with the OTG Defendants.

41.     All Defendants are collectively referred to as "Defendants."

## FACTUAL ALLEGATIONS

### OTG Management and OTG JFK T5 VENTURE, LLC
(collectively, the "OTG Defendants")

42.     At all times relevant, the OTG Defendants paid Tipped Workers at a reduced minimum wage rate.

43.     Instead of paying Tipped Workers the full minimum wage, the OTG Defendants took a "tip credit" against the minimum wage.

44.     The OTG Defendants did not satisfy the strict requirements under the FLSA and NYLL that would allow it to take a "tip credit" against its minimum wage obligations.

45.     Pursuant to its tip policy and practice, the OTG Defendants failed to provide Tipped Workers with a compliant statutorily required notice regarding their rates of pay.

46.     Pursuant to its policy and practice, the OTG Defendants required Tipped Workers to perform non-tip producing side work that was unrelated to their tipped occupation. As a result, Tipped Workers are engaged in a dual occupation while being compensated at the tip credit rate.

47.     Pursuant to its policy and practice, the OTG Defendants also required Tipped Workers to spend a substantial amount of time, more than twenty percent, performing non-tip-producing side

work related to the employees' tipped occupation.

48.     Specifically, the OTG Defendants required Tipped Workers to spend a substantial amount of time performing non-tip-producing "side work" including, but not limited to: (1) washing silverware, glassware, and dishes; (2) wiping tables and bar tops; (3) slicing and preparing garnishes for the bar; (4) restocking bars; (5) setting tables with paper placements, knives, forks, and napkins; (6) pouring condiments into containers; (7) cleaning and breaking down the coffee station and soda machines; (8) cleaning rubber mats kept behind the bar; (9) draining and cleaning ice bins; (10) keeping inventory of liquor and soda; (11) wiping down iPads on which customers placed orders; and (12) sweeping, mopping, and scrub-brushing the floors ("side work").

49.     The OTG Defendants typically scheduled Tipped Workers to work opening, mid-shift, and closing shifts.

50.     The OTG Defendants required Tipped Workers to perform side work before the restaurant opened, at the end of their shifts, and/or after the restaurant closed and customers left.

51.     For instance, the OTG Defendants typically required Tipped Workers to arrive at least fifteen minutes to an hour or more prior to the start of customer service and to stay at work approximately one hour after the restaurant or bar closed.

52.     The OTG Defendants also required Tipped Workers to stay until the departure of the last plane in the terminal, including when any flights were delayed in leaving or arriving, and often several hours after serving their last customer.

53.     During these periods, the OTG Defendants required Tipped Workers to perform side work.

54.     The side work and dual job duties described above are not specific to customers, tables, or sections, but are performed in mass quantities for the entire shift or for future shifts.

55. The OTG Defendants did not track the time that Tipped Workers spent performing non-tipped side work or dual job duties.

56. The OTG Defendants also maintained a policy and practice whereby Tipped Workers were encouraged and/or required to work off-the-clock.

57. For example, managers clocked Plaintiffs and Tipped Workers out for lunch breaks and other breaks that they did not take.

58. Managers often punched Plaintiffs and Tipped Workers out after their scheduled shift was over even if managers required Plaintiffs and Tipped Workers to continue working to reduce the recorded number of hours worked.

59. Although Plaintiffs and Tipped Workers continued to perform work for the OTG Defendants after their managers clocked them out, they did so off-the-clock and without compensation.

60. Some of the work that Plaintiffs and Tipped Workers performed off-the-clock was in excess of 10 hours within a shift.

61. While working off-the-clock at the end of their shifts, Plaintiffs and Tipped Workers engaged in non-tip producing side work, as described above in Paragraph 48.

62. At all relevant times, Plaintiffs and Tipped Workers often worked through their statutorily mandated breaks.

63. Plaintiffs and Tipped Workers notified their supervisors when they worked through their statutorily mandated breaks.

64. When supervisors were notified by Plaintiffs and Tipped Workers that they worked through their statutorily mandated breaks, they were instructed to clock in and out for their breaks after-the-fact via the OTG Defendants' online system.

65.     On information and belief, managers did not properly assign bartenders to customers via the OTG Defendants' electronic system, and as a result, bartenders and other Tipped Workers received no tips, or only a fraction of their tips.

66.     When Plaintiffs inquired with their managers, including Terminal Director, "Mo" who they could speak with regarding policy changes, "Mo" would reply "corporate."

67.     At all relevant times, the OTG Defendants constituted a joint employer and/or a single integrated enterprise within the meaning of the FLSA and NYLL. The OTG Defendants managed and controlled the terms and conditions of Plaintiffs' employment, acted directly or indirectly in the interest of one another with respect to Plaintiff, and exercised operational control over Plaintiff's work. Defendants share common business addresses, including JFK International Airport, Terminal 5 Jamaica, New York 11430[6], as well as common ownership, management, and executive leadership.

68.     Specifically, the OTG Defendants hired Plaintiffs, set their rates of pay, determined their work schedules, and supervised and directed their job duties. The OTG Defendants maintained and/or should have maintained Plaintiffs' payroll and employment records, including Plaintiffs' tips, and controlled pay practices. Further, the OTG Defendants issued Plaintiffs' paychecks.

69.     Thus, the OTG Defendants exercised substantial control over Plaintiffs' working conditions and possessed the authority to supervise and implement compensation policies and practices affecting Plaintiffs' wages and hours.

### Plaintiff Alexandra Gavrilova

70.     Plaintiff Gavrilova was employed by the OTG Defendants as a bartender at OTG Management's restaurants and bars, including, but not limited to, 5ivesteak and Piquillo, located at

---

[6] *See, e.g.*, Financing Agreement, at 111, *available at*: sec.gov/Archives/edgar/data/1656987/000156761916001672/s001076x5_ex10-1.htm.

JFK in Queens, New York, from in or around 2014 until approximately September 2025.

71.     The OTG Defendants owned and operated 5ivesteak, as well as several other restaurants and bars where Ms. Gavrilova worked.

72.     Since the start of her employment with the OTG Defendants, Ms. Gavrilova's employment was subject to a collective bargaining agreement between OTG JFK T5 VENTURE and WORKERS UNITED, LAUNDRY, DISTRIBUTION, AND FOOD SERVICE JOINT BOARD, SEIU.

73.     Ms. Gavrilova was at all times relevant a member (in good standing) of Defendant WORKERS UNITED.

74.     Ms. Gavrilova worked for the OTG Defendants for **over 11 years**.

75.     At no time had Ms. Gavrilova ever been told during her eleven years of employment with the OTG Defendants that her employment was in jeopardy for performance reasons, nor was Plaintiff Gavrilova ever formally disciplined, or advised that her work was deficient.

76.     Ms. Gavrilova approximately worked for the OTG Defendants between eight (8) and thirty-five (35) hours, sometimes more per week, primarily on Sundays, Mondays, and Thursdays.

77.     Ms. Gavrilova is Jewish and observes Shabbat, meaning, that as part of her religious observance she does not work from sunset on Friday through Saturday night.

78.     For at least 2025, Ms. Gavrilova was paid $11.00 per hour and some of her credit/debit card tips.

79.     The OTG Defendants did not pay Ms. Gavrilova for all the time that she was suffered or permitted to work each workweek.

80.     Throughout the duration of her employment at OTG, Ms. Gavrilova received paychecks from the OTG Defendants that did not properly record or compensate her for all the hours

that she worked.

81.     The OTG Defendants paid Ms. Gavrilova at the New York tipped minimum wage rate when she should have been paid at the full minimum wage rate.

82.     The OTG Defendants did not provide Ms. Gavrilova with proper notification of her rate or rates of pay under the FLSA and NYLL.

83.     While paying her at the sub-minimum, tip-credit wage, the OTG Defendants required Plaintiff Gavrilova to spend over 20 percent of her work time during bartending shifts performing work that had no customer interaction and that did not generate tips ("non-tipped duties").

84.     Plaintiff Gavrilova typically spent up to approximately 20 percent or more of her work time performing non-tipped duties as a bartender.

85.     When Plaintiff Gavrilova worked shifts as a bartender at OTG, the OTG Defendants required her to perform duties, including but not limited to: cutting fruit and vegetables for drink garnishes such as lemons, limes, oranges, celery, jalapenos; and mint leaves; filling fruit compartments on the bar with drink garnishes such as onions, olives, cherries, bleu cheese; pouring juices and milk into carafes and placing them at the bar; retrieving ice from another restaurant in the terminal and filling the ice bin for the bar; placing hot sauce bottles and steak sauce on the bar; filling ramekins with ketchup; receiving the morning delivery of beer, wine, and liquor, unpacking the boxes, and stocking the refrigerator and shelves; placing bottles of water in the refrigerator; polishing glassware and coffee mugs and placing them on the shelves behind the bar; polishing forks and placing them in the silverware tray; filling sugar caddies and placing them on the bar; stocking the coffee station with, tea kettles, sugar caddies, and spoons; setting tables for seats at the bar with knives, forks, napkins, and water glasses; wiping tablets in which the customers input their orders; and filling a bucket with sanitizer solution. Plaintiff Gavrilova spent *at least* two hours completing these tasks.

86.     During her employment, when Plaintiff Gavrilova worked bartender shifts, the OTG Defendants required her to perform closing duties, including but not limited to: sweeping the floor; mopping the floor; wiping down iPads; unlocking iPads and plugging them into the charging cart; taking out the trash; washing glassware and silverware; wiping down the bar top and barstools; using aluminum cleaner on the footrest at the bar; cleaning the dishwasher, emptying sanitizer buckets; melting ice; emptying and cleaning the ice bin; taking inventory of liquor, wine, and beer; wiping down liquor and wine bottles; wrapping liquor and wine bottles in plastic; putting liquor, wine, and beer away in the refrigerator and shelves; cleaning the espresso machine; cleaning the sink; and stock silverware tray with forks, napkins, and knives. Plaintiff Gavrilova spent *at least* two hours or more completing these tasks.

87.     During bartending shifts, Plaintiff Gavrilova was required to perform duties in between serving customers, for approximately twenty-five to thirty minutes, including but not limited to: washing glasses and forks; polishing glasses and forks; resetting the seats at the bar with knives, forks, napkins, and water glasses; retrieving liquor from other restaurants in the terminal; restocking liquor; refilling the ice bin; taking out the trash; changing the beer kegs; brewing tea and coffee; changing soda for the soda machine; cleaning the bar tops; replenishing straws; and preparing and serving food to customers.

88.     As a bartender, Plaintiff Gavrilova performed deep cleaning duties that varied, including, but not limited to: wiping down walls, shelves, and barstools; cleaning the footrests at the bar with aluminum cleaner; deck brushing the floor; cleaning the drains behind the bar; mopping; cleaning behind the refrigerators; and cleaning the garbage can.

89.     In or around July 2022 a number of the soft drink ice machines in the restaurants and/or bars operated by the OTG Defendants became inoperable.

90. The OTG Defendants failed to fix the soft drink ice machines, requiring OTG employees, including Plaintiffs, to retrieve ice from a large ice machine kept in a back kitchen space maintained by the OTG Defendants.

91. Having to retrieve ice daily from the large ice machine in the kitchen required Plaintiffs to fill large buckets and/or cups of ice for hundreds of thousands of passengers and airport and airline staff continuously throughout the day, due to the nature of ice.

92. While in the middle of her shift, sometimes while attending to up to three or more customers, Plaintiff Gavrilova was expected by management to go and retrieve ice.

93. Because she was unable to leave active customers, Plaintiff Gavrilova and other Tipped Workers had to tip porters out-of-pocket to retrieve ice for customers.

94. Often, Plaintiff Gavrilova and other Tipped Workers had to come early before their shifts and stay after their shifts ended, to help the next shift of workers retrieve ice for customers.

95. Plaintiff Gavrilova estimates that having retrieve ice for herself and other Tipped Workers' customers took approximately five (5) hours of her shift.

96. Plaintiff Gavrilova and other Tipped Workers complained to management about the broken ice machines and how time-consuming it was to have to regularly retrieve ice.

97. Management told Plaintiff Gavrilova and other Tipped Workers that they should "deal with it," or "ask a server to help."

98. From July 2022 throughout the remainder of her employment, Plaintiff Gavrilova had to continue retrieving ice.

99. As a result of the non-tipped work Plaintiff Gavrilova was required to do, including, but not limited to, deep cleaning and lifting heavy objects, Plaintiff Gavrilova sustained a shoulder injury, which has, and continues to require Plaintiff Gavrilova attend physical therapy.

100. Further, and as a result of the stress of her job, Plaintiff Gavrilova began to experience migraines, hair loss, anxiety, depression, and insomnia.

101. Plaintiff Gavrilova's conditions have required the attention of several medical practitioners.

102. As a result of the conditions described in Paragraphs 99 through 101, Plaintiff Gavrilova had to take two medical leaves – one in November 2024, and the other from February through April of 2025.

103. The OTG Defendants did not track the time that Plaintiff Gavrilova spent performing non-tipped side work or dual job duties.

104. Although Plaintiff should have been the full minimum wage, the OTG Defendants paid her an hourly rate that fell below the minimum wage.

105. The OTG Defendants frequently required Plaintiff Gavrilova to perform work off-the-clock without compensation.

106. For instance, the OTG Defendants clocked Plaintiff Gavrilova out for breaks she did not take.

107. The OTG Defendants compensated Plaintiff Gavrilova only for the time Plaintiff Gavrilova punched in.

108. During her employment, Plaintiff Gavrilova generally worked the following scheduled hours unless she missed time for vacation, sick days, holidays, or leave: from approximately 2014 until approximately September 2025, three shifts a week starting at approximately 2:00 pm until closing.

109. The OTG Defendants did not keep accurate records of wages or tips earned, or of hours worked by Plaintiff Gavrilova.

110.    The OTG Defendants failed to furnish Plaintiff Gavrilova with accurate statements of wages, hours worked, rates paid, or gross wages.

111.    Upon information and belief, Plaintiff Gavrilova earned cash tips, however, they were handled by management. As a result, Plaintiff Gavrilova had no way to tell what, if any, percentage of her tips paid were cash tips.

112.    Upon information and belief, the OTG Defendants failed at times to properly assign bartenders electronically to customers, resulting in bartenders receiving no tips that were paid by a customer, resulting in the misappropriation of bartenders' tips, including Plaintiff Gavrilova.

113.    Upon information and belief, the OTG Defendants sometimes assigned multiple bartenders to one customer. As a result, the OTG Defendants required bartenders to split the tips received amongst themselves, resulting in the misappropriation of tips, including those of Plaintiff Gavrilova.

114.    Ms. Gavrilova believed that her tips were being misappropriated because the total amount of tips which appeared on her paystub at the end of the week was significantly lower than what she had been given by customers when she processed their in-store payments, as documented on the customers' receipts.

115.    Ms. Gavrilova never received a breakdown of what portion of her tips, both cash and electronic, were being allocated to her.

116.    Additionally, throughout the duration of her employment, since the OTG Defendants failed to pay Ms. Gavrilova the proper minimum wage and misappropriated her tips, any wage notices provided to Ms. Gavrilova were inaccurate and misleading, in violation of NYLL § 195(1).

117.    Likewise, to the extent the OTG Defendants provided Ms. Gavrilova with wage statements, they were accurate and misleading, since the OTG Defendants failed to pay Ms. Gavrilova

17

the proper minimum wage and misappropriated her tips, in violation of NYLL § 195(3).

118. The OTG Defendants' failure to provide Ms. Gavrilova with compliant notices of her pay rate and accurate pay stubs with each payment throughout her employment, in violation of NYLL § 195(1) and NYLL § 195(3), effectively concealed from Ms. Gavrilova, and/or interfered with her ability to identify and assess the wage violations that were, and ongoing. Ms. Gavrilova's resulting lack of information complicated, or impeded, her efforts to remedy those violations.  Because of the resulting underpayment of wages/tips, Ms. Gavrilova was deprived of the opportunity to spend her wages on necessary expenses, including household expenses, food, housing, utilities, and other items; to save her wages in interest-bearing accounts; or to otherwise invest her wages in other ways that could generate additional earnings.

119. On or around July 2025, the OTG Defendants began implementing a new system for bidding on shifts through their electronic system, Dayforce.

120. The new bid system failed to honor the seniority of OTG Defendants' longstanding employees, including Plaintiff Gavrilova.

121. On July 21, 2025, Plaintiff Gavrilova emailed representative for Defendant WORKERS UNITED, Standford Dempster ("Mr. Dempster"), expressing her concerns and issues with the OTG Defendants' new bidding system and loss of seniority.

122. On July 23, 2025, Plaintiff Gavrilova filed a grievance regarding the OTG Defendants' bidding system and loss of seniority with Defendant WORKERS UNITED using their online grievance filing form.

123. Having still received no response from Mr. Dempster or Defendant WORKERS UNITED, on August 8, 2025, Plaintiff Gavrilova again emailed Mr. Dempster expressing her concerns.

124.    As a result of the new bidding system, Plaintiff Gavrilova was unable to bid on and receive days she previously took shifts such as Sundays, Mondays, and Thursdays because newer, full-time employees were permitted to bid prior to part-time employees, such as Plaintiff Gavrilova.

125.    Because of this, after other workers bid ahead of Plaintiff Gavrilova, the primary shifts left available to her were on Fridays and Saturdays.

126.    Ms. Gavrilova is Jewish and observes Shabbat, meaning, that as part of her religious observance she does not work from sunset on Friday through Saturday night.

127.    On or around mid-August 2025, Ms. Gavrilova began inquiring to management about her days off and a religious accommodation.

128.    On or around mid-August 2025, Ms. Gavrilova had an in-person conversation with OTG Management Senior HR Business Partner, Shamelie Rafick ("Ms. Rafick") and Terminal Director/Director of Operations, Justin Winger ("Mr. Winger"), who told Ms. Gavrilova that the only way she could be accommodated is if she provided "a doctor's note for medical reasons."

129.    On August 22, 2025, Ms. Gavrilova followed up with Ms. Rafick via text, confirming that for her "days off for Shabbat" she would "need to provide a doctor's note." Ms. Gavrilova specifically asked for "Friday and Saturday off" for observance.

130.    In response, Ms. Rafick replied, that anyone who needs a "reasonable accommodation…must go through the process with MetLife," and that it is "based on medical needs." Ms. Rafick further instructed Ms. Gavrilova that a "[r]eligious accommodation is granted when an employee is scheduled to work and needs to step away to pray for a few minutes."

131.    Upon information and belief, around the same time, Ms. Rafick created an entirely new shift for another part-time Tipped Worker that had only worked for the OTG Defendants for three (3) years, that required an accommodation due to their school schedule.

132. Ms. Gavrilova continued to have difficulty obtaining shifts with the OTG Defendants that accommodated her religious observance.

133. The OTG Defendants were aware of Ms. Gavrilova's Jewish faith and observance of Shabbat on Fridays and Saturdays.

134. Contrary to the law, the OTG Defendants failed to engage in an interactive process when Ms. Gavrilova stated her need for a religious accommodation.

135. Instead, the OTG Defendants told Ms. Gavrilova she could "step away and pray for a few minutes."

136. The OTG Defendants failed to provide Ms. Gavrilova with a reasonable accommodation to allow her to perform her job and/or remain employed.

137. The OTG Defendants knew at all times that Ms. Gavrilova's religious observance could have been easily accommodated and/or addressed because it was in the past.

138. The OTG Defendants made no assessment of Ms. Gavrilova's religious observance and whether any reasonable accommodation could be made.

139. The OTG Defendants made no assessment to determine if an accommodation to Ms. Gavrilova would have caused them undue hardship, difficulty, or expense.

140. Accommodations available to Plaintiff Gavrilova would have caused no undue hardship on the OTG Defendants.

141. On September 17, 2025, Plaintiff Gavrilova again emailed Mr. Dempster with Defendant WORKERS UNITED, explaining to him how the OTG Defendants' scheduling and dissolution of seniority had resulted in a "significant disruption" to Plaintiff Gavrilova's work schedule, "leaving [her] without income and facing considerable financial hardship," and that the "stress and anxiety" had "severely impacted [her] well-being, necessitating professional medical

20

attention."

142. On September 18, 2025, Mr. Dempster replied that he would send a "grievance for to which [sic]" Ms. Gavrilova could "file a grievance," in which she could outline "where [she] [thought] the schedule [was] not fair."

143. Later that same day, Plaintiff Gavrilova responded to Mr. Dempster's email with a screenshot of the grievance she filed on July 23, 2025, and stating that she "already filed a grievance back in July and [he] never responded." Plaintiff Gavrilova additionally stated that she had "expressed all of [her] concerns in multiple emails…sent months ago in regards to the schedule and there has been no response."

144. Plaintiff Gavrilova received no further response from Mr. Dempster or Defendant WORKERS UNITED.

145. As a result of the OTG Defendants' actions, Plaintiff Gavrilova was unable to obtain enough shifts with the OTG Defendants and had no other choice but to end her employment with the OTG Defendants.

146. As a result of the OTG Defendants' actions, Plaintiff Gavrilova has been caused to be emotionally distraught, depressed, anxious, jobless, humiliated, and degraded.

147. As a result of the acts and conduct complained of herein, Plaintiff Gavrilova suffered a loss of income, loss of employment, loss of retirement benefits, loss of a salary/pay, special damages, and other compensation with such employment entails, breach of collective bargaining rights/protections, future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

148. The OTG Defendants' conduct was malicious, willful, outrageous, and conducted with full knowledge of the law, and/or violation thereof.

149.    Ms. Gavrilova has been designated as a class representative for the FLSA Collective Action and the New York Class. Ms. Gavrilova is ready, willing and able to accept the responsibilities of being a class representative.

### Plaintiff Annemarie Wooding

150.    Plaintiff Wooding was employed by the OTG Defendants as a bartender at OTG Management's restaurants and bars, including those branded Velocity Bar, among others located at JFK in Queens, New York, from in or around April 15, 2011, until approximately October 17, 2025.

151.    While Plaintiff Wooding was employed by the OTG Defendants, she worked at several bars, including, but not limited to, Velocity Bar, "Gate 6 Bar," and "7NC," which were owned and operated by OTG Management.

152.    Since the start of her employment with the OTG Defendants, Ms. Wooding's employment was subject to a collective bargaining agreement between OTG JFK T5 VENTURE LLC and WORKERS UNITED, LAUNDRY, DISTRIBUTION, AND FOOD SERVICE JOINT BOARD, SEIU ("Defendant WORKERS UNITED").

153.    Ms. Wooding was at all times relevant a member (in good standing) of Defendant WORKERS UNITED.

154.    Ms. Wooding worked for the OTG Defendants for **over 12 years**.

155.    At no time had Ms. Wooding ever been told during her twelve years of employment with Defendants that her employment was in jeopardy for performance reasons, or for any other reason, nor was Plaintiff Wooding ever formally disciplined, written up or advised that her work was deficient.

156.    While Ms. Wooding was employed by the OTG Defendants, she worked at least three ten (10) hour shifts between hours per week, primarily on Sundays, Thursdays, and Fridays.

157.     For 2025 through October 17, 2025, Ms. Wooding was paid $11.00 per hour, plus cash tips, and some of her credit/debit card tips.

158.     The OTG Defendants did not pay Ms. Wooding for all the time that she was suffered or permitted to work each workweek.

159.     Throughout the duration of her employment with the OTG Defendants, Ms. Wooding received paychecks from OTG JFK T5 VENTURE, LLC that did not properly record or compensate her for all the hours that she worked.

160.     The OTG Defendants paid Ms. Wooding at the New York tipped minimum wage rate when she should have been paid at the full minimum wage rate.

161.     While paying her at the sub-minimum, tip-credit wage, the OTG Defendants required Plaintiff Wooding to spend over 20 percent of her work time during bartending shifts performing work that had no customer interaction and that did not generate tips ("non-tipped duties").

162.     Plaintiff Wooding typically spent up to approximately 20 percent or more of her work time performing non-tipped duties as a bartender.

163.     When Plaintiff Wooding worked shifts as a bartender for the OTG Defendants, she was required to perform duties, including but not limited to: cutting fruit and vegetables for drink garnishes such as lemons, limes, oranges, celery, jalapenos; and mint leaves; searching for available garnishes at other OTG restaurants and bars; filling fruit compartments on the bar with drink garnishes such as onions, olives, cherries; retrieving ice from another restaurant in the terminal and filling the ice bin for the bar; placing hot sauce bottles and steak sauce on the bar; filling ramekins with ketchup; receiving the morning delivery of beer, wine, and liquor, unpacking the boxes, and stocking the refrigerator and shelves; placing bottles of water in the refrigerator; polishing glassware and coffee mugs and placing them on the shelves behind the bar; polishing forks and placing them in the

23

silverware tray; filling sugar caddies and placing them on the bar; putting out paper napkins and water glasses; wiping tablets in which the customers input their orders; and filling a bucket with sanitizer solution. Plaintiff Wooding spent *at least* two hours completing these tasks.

164. During her employment, when Plaintiff Wooding worked opening and evening bartender shifts, the OTG Defendants required her to perform closing duties, including but not limited to: sweeping the floor; mopping the floor; wiping down iPads; unlocking iPads and plugging them into the charging cart; taking out the trash; washing glassware; wiping down the bar top and barstools; using aluminum cleaner on the footrest at the bar; cleaning the dishwasher, emptying sanitizer buckets; melting ice; emptying and cleaning the ice bin; taking inventory of liquor, wine, and beer; wiping down liquor and wine bottles; wrapping liquor and wine bottles in plastic; putting liquor, wine, and beer away in the refrigerator and shelves; scrubbing the inside of beer kegs; cleaning the sink; and stock napkins; and searching for other items at other OTG restaurants and bars, such as plastic silverware and ketchup. Plaintiff Wooding spent approximately one hour and a half to two hours completing these closing tasks.

165. During bartending shifts, Plaintiff Wooding was required to perform duties in between serving customers, for approximately twenty-five to thirty minutes, including but not limited to: washing glasses and forks; polishing glasses and forks; resetting the seats at the bar with knives, forks, napkins, and water glasses; retrieving liquor from other restaurants in the terminal; restocking liquor; refilling the ice bin; taking out the trash; changing the beer kegs; brewing tea and coffee; changing soda for the soda machine; cleaning the bar tops; replenishing straws; and preparing and serving food to customers.

166. As a bartender, Plaintiff Wooding performed deep cleaning duties that varied, including, but not limited to: wiping down walls, shelves, and barstools; cleaning the footrests at the

24

bar with aluminum cleaner; deck brushing the floor; cleaning the drains behind the bar; mopping; cleaning behind the refrigerators; and cleaning the garbage can.

167.    In or around July 2022 a number of the soft drink ice machines in the restaurants and/or bars operated by the OTG Defendants became inoperable.

168.    The OTG Defendants failed to fix the soft drink ice machines, requiring OTG employees, including Plaintiffs, to retrieve ice from a large ice machine kept in a back kitchen space maintained by the OTG Defendants.

169.    Having to retrieve ice daily from the large ice machine in the kitchen required Plaintiffs to fill large buckets and/or cups of ice for hundreds of thousands of passengers and airport and airline staff continuously throughout the day, due to the nature of ice.

170.    While in the middle of her shift, sometimes while attending to up to three or more customers, Plaintiff Wooding was expected by management, including Director of Operations, Shanique Mahoney ("Ms. Mahoney"), to go and retrieve ice.

171.    Because she was unable to leave active customers, Plaintiff Wooding and other Tipped Workers had to tip porters out-of-pocket to retrieve ice for customers.

172.    Often, Plaintiff Wooding and other Tipped Workers had to come early before their shifts and stay after their shifts ended, to help the next shift of workers retrieve ice for customers.

173.    Plaintiff Wooding estimates that having retrieve ice for herself and other Tipped Workers' customers took approximately five (5) hours of her shift.

174.    Plaintiff Wooding and other Tipped Workers complained to Ms. Mahoney and then-Terminal Director, Kent Tiller ("Mr. Tiller") about the broken ice machines, how time-consuming it was to have to regularly retrieve ice, and that this violated the "80/20"[7] rule.

---

[7] The "80/20" rule refers to the law prohibiting employers from taking a tip credit where an employee works more that

175. Ms. Mahoney told Plaintiff Wooding and other Tipped Workers that if they couldn't "handle it" they could "go to another bar."

176. Plaintiff Wooding and other Tipped Workers had to go to "Mo" to inform him of the 80/20 rule violation.

177. Shortly thereafter, Plaintiff Wooding and other Tipped Workers were no longer required to regularly retrieve ice.

178. Plaintiff Wooding and other Tipped Workers were required to regularly retrieve ice from July 2022 through February 2023.

179. The OTG Defendants did not track the time that Plaintiff Wooding spent performing non-tipped side work or dual job duties.

180. Although Plaintiff Wooding should have been the full minimum wage, the OTG Defendants paid her an hourly rate that fell below the minimum wage.

181. The OTG Defendants frequently required Plaintiff Wooding to perform work off-the-clock without compensation.

182. For instance, the OTG Defendants clocked Plaintiff Wooding out for breaks she did not take.

183. The OTG Defendants compensated Plaintiff Wooding only for the time Plaintiff Wooding punched in.

184. During her employment, Plaintiff Wooding generally worked three shifts per week, sometimes more, unless she missed time for vacation, sick days, holidays, or leave. Plaintiff Wooding usually worked opening shifts starting at approximately 5:00 am and ending at approximately 3:00 pm, or shifts scheduled from 3:00 pm until closing.

---

20% or two hours of their shift in a non-tipped job capacity. *See,* 12 N.Y.C.R.R. § 149-2.9.

185.    For period during her employment with the OTG Defendants, Plaintiff Wooding was regularly scheduled to work 10-hour shifts. Even when she was not scheduled to work 10-hour shifts, when her shifts exceeded 10 hours, Plaintiff Wooding was instructed by management to clock out after 10 hours, even if she was still working.

186.    The OTG Defendants did not keep accurate records of wages or tips earned, or of hours worked by Plaintiff Wooding.

187.    The OTG Defendants failed to furnish Plaintiff Wooding with accurate statements of wages, hours worked, rates paid, or gross wages.

188.    Upon information and belief, Plaintiff Wooding earned cash tips, however, they were primarily handled by management. As a result, Plaintiff Wooding had no way to tell what, if any, percentage of her tips paid were cash tips.

189.    Upon information and belief, the OTG Defendants failed at times to properly assign bartenders electronically to customers, resulting in bartenders receiving no tips that were paid by a customer, resulting in the misappropriation of bartenders' tips, including Plaintiff Wooding.

190.    Upon information and belief, the OTG Defendants sometimes assigned multiple bartenders to one customer. As a result, the OTG Defendants required bartenders to split the tips received amongst themselves, resulting in the misappropriation of tips, including those of Plaintiff Wooding.

191.    Ms. Wooding believed that her tips were being misappropriated because on at least one occasion, when receiving a tip report at the end of the day from her manager, Ms. Mahoney, Ms. Wooding was told she earned a certain amount of tips in total but was paid a different amount than the total tips she earned. Further, Ms. Wooding believed the total amount of tips which appeared on her paystub at the end of the week was significantly lower than what she had been given by customers

27

when she processed their in-store payments, as documented on the customers' receipts.

192.    Ms. Wooding never received a breakdown of what portion of her tips, both cash and electronic, were being allocated to her.

193.    Additionally, throughout the duration of her employment, since the OTG Defendants failed to pay Ms. Wooding the proper minimum wage and misappropriated her tips, any wage notices provided to Ms. Wooding were inaccurate and misleading, in violation of NYLL § 195(1).

194.    Likewise, to the extent the OTG Defendants provided Ms. Wooding with wage statements, they were accurate and misleading, since the OTG Defendants failed to pay Ms. Wooding the proper minimum wage and misappropriated her tips, in violation of NYLL § 195(3).

195.    The OTG Defendants' failure to provide Ms. Wooding with compliant notices of her pay rate and accurate pay stubs with each payment throughout her employment, in violation of NYLL § 195(1) and NYLL § 195(3), effectively concealed from Ms. Wooding, and/or interfered with her ability to identify and assess the wage violations that were, and ongoing. Ms. Wooding's resulting lack of information complicated, or impeded, her efforts to remedy those violations.  Because of the resulting underpayment of wages/tips, Ms. Wooding was deprived of the opportunity to spend her wages on necessary expenses, including household expenses, food, housing, utilities, and other items; to save her wages in interest-bearing accounts; or to otherwise invest her wages in other ways that could generate additional earnings.

196.    On or around July 2025, the OTG Defendants began implementing a new system for bidding on shifts through their electronic system, Dayforce.

197.    The new bid system failed to honor the seniority of OTG Defendants' longstanding employees, including Plaintiff Wooding.

198.    As a result, Plaintiff Wooding was unable to bid on and receive days she previously

took shifts such as Sunday nights, and Thursdays and Friday closing shifts, because newer, full-time employees were permitted to bid prior to part-time employees, such as Plaintiff Wooding.

199.    Because of this, after other workers bid ahead of Plaintiff Wooding, there were few shifts left available to her.

200.    As a result, Ms. Wooding felt she had no other choice than to end her employment with the OTG Defendants and seek another job.

201.    Ms. Wooding has been designated as a class representative for the FLSA Collective Action and the New York Class. Ms. Wooding is ready, willing and able to accept the responsibilities of being a class representative

## FLSA COLLECTIVE ALLEGATIONS

202.    Plaintiffs Ms. Gavrilova and Ms. Wooding bring this action pursuant to 29 U.S.C. § 216(b) on their own behalf, as well as those in the following class: Current and former tipped employees of OTG Management, who were employed at restaurants and bars owned, operated, and/or controlled by OTG Management in JFK, for a period of three years prior to the filing of the original Complaint and the date of final judgment in this matter ("FLSA Plaintiffs").

203.    At all relevant times, Ms. Gavrilova and Ms. Wooding and the members of the FLSA Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subject to the OTG Defendants' decision, plan and common policies, programs, practices, procedures, protocols, routines, and rules of willfully failing to pay the FLSA Plaintiffs the legally required minimum wage for all hours worked, requiring Tipped Workers to engage in dual job duties and side work for more than twenty percent of their time at work, misappropriating tips, and failing to provide proper notice regarding the wages and wage rates paid to the FLSA Plaintiffs. The OTG Defendants also required the FLSA Plaintiffs to work off-the-clock

and without compensation in violation of the FLSA. The claims of Plaintiffs herein are essentially the same as those of the other FLSA Plaintiffs.

204.     The OTG Defendants' unlawful conduct, as described in this Class and Collective Action Complaint, is pursuant to a corporate policy or practice of minimizing labor costs by failing to records the hours that employees work.

205.     The OTG Defendants are aware or should have been aware that federal law requires them to pay employees minimum wage for all the hours they work.

206.     The OTG Defendants' unlawful conduct has been widespread, repeated, and consistent.

207.     This case is properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. § 216(b).  The FLSA Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from the OTG Defendants.

## NYLL CLASS ALLEGATIONS

208.     Plaintiffs Ms. Gavrilova and Ms. Wooding bring this complaint, pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt persons employed by the OTG Defendants in any tipped position during the relevant time period ("NYLL Class").

209.     *Numerosity:* The members of the Rule 23 Class are so numerous that joinder of all members in the case would be impracticable. Plaintiffs reasonably estimate there are at least 40 Class Members who reside and work in New York. The precise number of Class Members should be readily available from a review of the OTG Defendants' personnel and payroll records.

210.     *Commonality/Predominance:* There is a well-defined community of interest among the Rule 23 Class Members and common questions of *both* law and fact predominate in the action over

any questions affecting individual members. These common legal and factual questions include, but are not limited to, the following:

    a.  Whether the OTG Defendants violated NYLL Articles 6 and 19, and the supporting New York State Department of Labor Regulations;

    b.  whether the OTG Defendants paid the NYLL Class the proper minimum wage for all hours worked;

    c.  at what common rate, or rates subject to common methods of calculation, the OTG Defendants were required to pay the Plaintiffs and NYLL Class for their work;

    d.  whether the OTG Defendants have a policy of requiring tipped employees to engage in side work for two hours or more per day and/or for more than twenty percent of their time at work;

    e.  whether the OTG Defendants have a policy of requiring tipped employees to work shifts longer than 10 hours in duration without additional proper compensation;

    f.  whether the OTG Defendants had a policy or practice of failing to provide adequate notice of payment to Plaintiffs and the NYLL Class, as required by NYLL § 195(1);

    g.  whether the OTG Defendants maintained a policy or practice of requiring, suffering, or permitting the Plaintiffs and NYLL Class to work off-the-clock without proper compensation;

    h.  whether the OTG Defendants failed to keep true and accurate time and pay records for all hours worked by the Plaintiffs and NYLL Class;

    i.  whether the OTG Defendants had a policy or practice of failing to provide Plaintiff and the NYLL Class with sufficient and accurate wage statements with each payment, as required by NYLL § 195(3);

    j.  whether the OTG Defendants misappropriated Plaintiffs' tips;

    k.  whether the OTG Defendants failed to keep accurate records of tips earned by and paid to employees;

    l.  whether Plaintiffs and the members of the Class are entitled to damages, and if so, the method by which such damages should be calculated; and

    m.  whether the OTG Defendants are liable for the attorneys' fees and costs of the members of the Class.

211.   *Typicality:* Plaintiffs' claims are typical of those of the Rule 23 Class in that the

Plaintiffs and all other members suffered damages as a direct and proximate result of the OTG Defendants' common and systemic payroll policies and practices. Plaintiffs' claims arise from the same policies, practices, and course of conduct as all other Rule 23 Class Members' claims and Plaintiffs' legal theories are based on the same legal theories as all other Rule 23 Class Members, as detailed above.

212.    *Adequacy:* Plaintiffs will fully and adequately protect the interests of the Rule 23 York Class. Furthermore, Class Counsel, Bell Law Group, PLLC are highly qualified to litigate Plaintiffs' and the class's claims.

213.    *Superiority:* A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, inter alia, it is economically unfeasible for the Rule 23 Class Members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual, along with the fear of reprisal by their employer

214.    The case will be manageable as a class action because the OTG Defendants should have payroll systems that will allow the wage-and-hour damages issues in the case to be resolved with relative ease. Because the elements of Rule 23(b)(3), or in the alternative (c)(4), are satisfied in the case, class certification is appropriate.

215.    The OTG Defendants acted on grounds generally applicable to the Class, thereby making relief, including declaratory and/or injunctive relief, appropriate for the Class.

## FIRST CAUSE OF ACTION
### Fair Labor Standards Act - Misappropriation of Gratuities

216.    Plaintiffs, the FLSA Plaintiffs, and the NYLL Class repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

217.    Section 203(m)(2)(b) of the FLSA provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any

32

portion of employees' tips, regardless of whether or not the employer takes a tip credit."

218. In 2018, Congress amended the FLSA to add a cause of action for an employer's unlawful retention of tips. See 29 U.S.C. § 203(m)(2)(B); id. § 216(b) ("Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages.").

219. Plaintiffs, the FLSA Plaintiffs and others similarly situated were "employees" and the OTG Defendants were their "employers" under the FLSA, § 203.

220. The OTG Defendants violated the FLSA by unlawfully retaining and/or distributing their bartenders' and other tipped workers' tips.

221. The OTG Defendants' violations of the FLSA were repeated, willful, intentional, and in bad faith.

222. As a result of The OTG Defendants' willful and intentional unlawful conduct, Plaintiffs and the FLSA Plaintiffs are entitled to damages in an amount to be determined at trial, liquidated damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, all other damages available under federal law, and such other legal and equitable relief as this Court deems just and proper.

### SECOND CAUSE OF ACTION
### NYLL § 652 – Minimum Wage

223. The Plaintiffs, on behalf of themselves and the NYLL Class, repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

224. The OTG Defendants have engaged in a widespread pattern, policy, and practice of violating the NYLL, as detailed in this Class and Collective Action Complaint.

225.     At all times relevant, the Plaintiffs and the NYLL Class have been employees of the OTG Defendants, and the OTG Defendants have been the employer of the Plaintiffs and the NYLL Class within the meaning of the NYLL §§ 650, *et seq*., and the supporting New York State Department of Labor Regulations.

226.     At all times relevant, Plaintiffs and the NYLL Class have been covered by the NYLL.

227.     The wage provisions of Article 19 of the NYLL and the New York State Department of Labor Regulations apply to the OTG Defendants and protect the Plaintiffs and the NYLL Class.

228.     The OTG Defendants failed to pay the Plaintiffs and the NYLL Class the minimum hourly wages to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations.

229.     The OTG Defendants failed to provide the Plaintiffs and the NYLL Class with the statutorily required notices reflecting their correct rate or rates of pay.

230.     The OTG Defendants required Plaintiffs and the NYLL Class to perform a substantial amount of non-tipped side work in excess of two hours or more than twenty percent of their work time. During these periods, the Plaintiffs and the NYLL Class were engaged in a non-tipped occupation, yet they were compensated by the OTG Defendants at the tipped minimum wage or lower rate, rather than the full hourly minimum wage rate as required by the NYLL and the supporting New York State Department of Labor Regulations.

231.     Further, the OTG Defendants required Plaintiffs and the NYLL Class to perform work off-the-clock and without compensation, depriving them of the minimum wage.

232.     The OTG Defendants were required to pay Plaintiffs and the NYLL Class the full minimum wage rate of: (a) $15.00 per hour for all hours worked on and after December 31, 2018; (b) $16.00 per hour for all hours worked on and after January 1, 2024; (c) $16.50 per hour for all hours

34

worked on and after January 1, 2025; (d) $17.00 per hour for all hours worked on and after January 1, 2026 through present under the NYLL §§ 650, *et seq*., and the supporting New York State Department of Labor Regulations.

233.   Due to the OTG Defendants' willful violations of the NYLL, Plaintiffs and the NYLL Class are entitled to recover from the OTG Defendants their unpaid minimum wages, liquidated damages, as provided for by the NYLL, reasonable attorneys' fees, costs, and pre and post-judgment interest.

## THIRD CAUSE OF ACTION
### NYLL § 196-d - Misappropriation of Gratuities

234.   Plaintiffs, the FLSA Plaintiffs, and the New York Class repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

235.   Pursuant to NYLL § 196-d, "[n]o employer or his agent or an officer or agent of any corporation, or any other person. . . shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee."

236.   Here, at all relevant times, the OTG Defendants collected and retained gratuities which were given to Plaintiffs.

237.   At all relevant times the OTG Defendants unlawfully distributed Plaintiffs' tips to other tipped workers, absent the existence of a tip share or tip pool, in violation of the NYLL.

238.   As a result of the OTG Defendants' unlawful conduct, Plaintiffs and the proposed members of the NYLL Class were denied tips to which they were otherwise entitled.

239.   Defendants willfully and intentionally violated § 196-d of the NYLL.

240.   As a result of the OTG Defendants' willful and intentional unlawful conduct, Plaintiffs

and the proposed members of the NYLL Class are entitled to damages in an amount to be determined at trial, liquidated damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, all other damages available under New York law, and such other legal and equitable relief as this Court deems just and proper.

## FOURTH CAUSE OF ACTION
### NYLL § 195(1) - Failure to Provide Notices Upon Hiring

241.     Plaintiffs, FLSA Plaintiffs, and the New York Class repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

242.     Pursuant to the New York Wage Theft Prevention Act ("WTPA"), employers must provide employees with notice "at the time of hiring" of, among other information, "the rate or rates of pay and basis thereof…" NYLL § 195-1(a).

243.     Defendants knowingly failed to comply with this provision by failing to provide Plaintiffs and Class Members with notice meeting the requirements of NYLL § 195(1)(a).

244.     Specifically, to the extent any notices were given to Plaintiffs, it failed to advise Plaintiffs of their accurate rates of pay.

245.     As a result of the OTG Defendants' noncompliance, Plaintiffs and Class Members suffered adverse consequences because they did not receive proper information about their wages and can demonstrate concrete injury.

246.     Based on the foregoing, Defendants are liable to Plaintiffs and Class Members in the amount of $5,000.00 per employee, plus reasonable attorney's fees and costs, and any other relief appropriate pursuant to NYLL § 198.

## FIFTH CAUSE OF ACTION
### NYLL § 195(3) - Failure to Provide Wage Statements

247.     Plaintiffs, the FLSA Plaintiffs, and the New York Class repeat, reiterate, and reallege

each and every allegation set forth above with the same force and effect as if more fully set forth herein.

248.    Pursuant to NYLL § 195(3), every employer is required to: furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages.

249.    During the course of Plaintiffs' and Class Members' employment, the OTG Defendants consistently and willfully failed to provide them with adequate wage statements as required by New York law. To the extent any paystubs were given to Plaintiffs, they were inaccurate and misleading, since they did not reflect the actual regular rate owed to Plaintiffs, and failed to accurately state the tips that were earned by and owed to Plaintiffs.

250.    NYLL § 198(1)(d) provides that any employee not provided appropriate wage statements may collect damages of $250.00 for each workday that the violation occurred or continued to occur, up to a total of $5,000.00 per employee, together with costs and reasonable attorneys' fees, as well as appropriate injunctive and/or declaratory relief.

251.    The OTG Defendants are therefore liable to Plaintiffs and Class Members in the amount of $5,000.00 per employee, plus reasonable attorney's fees and costs, and any other relief appropriate pursuant to NYLL § 198.

**SIXTH CAUSE OF ACTION**
**NYLL §§ 193(1)(a) - Unlawful Deductions**

252.    Plaintiffs, the FLSA Plaintiffs, and the New York Class repeat, reiterate, and reallege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

37

253.    NYLL § 193(1) provides that "[n]o employer shall make any deduction from the wages of an employee, except deductions which: (a) are made in accordance with the provisions of any law or any rule or regulation issued by any governmental agency . . .." NYLL § 193(1)(a).

254.    The OTG Defendants' deductions from Plaintiffs' compensation were not in accordance with any law or regulation.

255.    Specifically, the OTG Defendants have taken a portion of Ms. Gavrilova's and Ms. Wooding's tips and gratuities that they received directly from customers while working as a bartender for the OTG Defendants.

256.    As a result of the OTG Defendants' willful and intentional unlawful conduct, Plaintiffs and the proposed members of the NYLL Class are entitled to damages in an amount to be determined at trial, liquidated damages, attorneys' fees, costs, pre-judgment interest, post-judgment interest, all other damages available under New York law, and such other legal and equitable relief as this Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### NYLL §§ 190, *et seq.*, §§ 650, *et seq.*, and 12 NYCRR § 146-1.6 – Spread of Hours

257.    Plaintiffs, the FLSA Plaintiffs, and the New York Class reallege and incorporate by reference the foregoing allegations as if set forth fully here.

258.    The NYLL requires employers to pay an extra hour's pay for every day that an employee works an interval in excess of ten hours pursuant to NYLL §§ 190, *et seq.*, §§ 650, *et seq.*, and Part 146, Title 12 of the New York Codes Rules and Regulations ("NYCRR") (the "Hospitality Wage Order").

259.    The OTG Defendants required Plaintiffs and the NYLL Class to work shifts that were ten hours or longer in duration.

260.    The OTG Defendants failed to properly pay Plaintiffs and the NYLL Class for shifts

that were ten hours or longer in duration.

261.     The OTG Defendants' failure to pay Plaintiffs and the NYLL Class spread-of-hours pay was not in good faith.

**EIGHTH CAUSE OF ACTION**
**29 U.S.C. § 185 – Breach of Collective Bargaining Agreement**
**(Against the OTG Defendants)**

262.     Plaintiffs, the FLSA Plaintiffs, and the New York Class reallege and incorporate by reference the foregoing allegations as if set forth fully here.

263.     Article 19 of the Collective Bargaining Agreement (the "Agreement") between OTG JFK T5 VENTURE, LLC and Defendant WORKERS UNITED states that OTG JFK T5 VENTURE, LLC (the "Employer") "may make and/or continue and from time to time add or change such reasonable rules and regulations as it may deem necessary and proper for the conduct and management of its business, provided the same *are not inconsistent with any provisions of this Agreement*." The Employer shall give the Union one (1) weeks' notice of any new or changed rules. All such rules and regulations shall be observed by the employees." (emphasis added).

264.     Article 8 defines "Company Seniority" as an employee's length of continuous service as measured by the employee's most recent date of hire with the Employer." Article 8 further provides that, "[t]he Employer shall maintain separate seniority lists for full-time *and part-time employees*." (emphasis added).

265.     Under the Agreement, termination of seniority only occurs "if an employee is discharged for cause, voluntarily quits or is absent for reasons [outlined in the Agreement]…" or "if any employee…accepts another position."

266.     On or around July 2025, the OTG Defendants implemented a new scheduling bidding system that was no longer based on employees' seniority.

267. The above practice is inconsistent with the Agreement.

268. As a result, Plaintiffs were unable to bid for scheduling days that provided them with enough days to work, ultimately, leaving Plaintiffs with no choice but to seek other employment.

269. The OTG Defendants' actions constitute a breach of contract claim, for violating the terms of their Collective Bargaining Agreement.

270. Additionally, the OTG Defendants' conduct amounts to unfair labor practices according to 29 U.S.C. § 158(a)(1) which states "[i]t shall be an unfair labor practice for an employer [to] interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157."

271. Where 29 U.S.C. § 157 states "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

272. The OTG Defendants breached the collective bargaining process and thus interfered with the exercise of the Plaintiffs' rights.

273. The OTG Defendants had an obligation to bargain collectively, and fairly, as stated in 29 U.S.C. § 158(d), which states that "…to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment."

274. The OTG Defendants have demonstrated unfair labor practices by breaching their obligation to fairly practice collective bargaining, which interfered with the exercise of Plaintiffs'

rights.

## NINTH CAUSE OF ACTION
### 29 U.S.C. § 185 – Breach of Duty of Fair Representation
### (Against Defendant Workers United)

275.    Plaintiffs, the FLSA Plaintiffs, and the New York Class reallege and incorporate by reference the foregoing allegations as if set forth fully here.

276.    On or around July 2025, the OTG Defendants implemented a new scheduling bidding system that was no longer based on employees' seniority.

277.    Shortly thereafter, on July 21, 2025, Plaintiff Gavrilova emailed Defendant WORKERS UNITED representative Mr. Dempster notifying him of the system changes and her inability to bid for sufficient days of work.

278.    On July 23, 2025, Plaintiff Gavrilova filed a grievance with Defendant WORKERS UNITED, in accordance with their grievance procedures.

279.    Plaintiff Gavrilova never received a response from Mr. Dempster or Defendant WORKERS UNITED.

280.    Defendant WORKERS UNITED's procedures provide that, once a member files a grievance, they "should hear back from [their] union representative within 48 hours."[8]

281.    On August 8, 2025, Plaintiff Gavrilova again emailed Mr. Dempster. Again, Ms. Gavrilova received no response.

282.    Ms. Gavrilova did not receive a response from Mr. Dempster until September 17, 2025, which instructed her to file a grievance.

283.    Ms. Gavrilova replied to Mr. Dempster telling him that she had already filed a

---

[8] Workers United, Laundry Distribution & Food Service Union, SEIU, "Grievances/Complaint Forms," http://ldfsunion.org/want-to-file-a-grievances-or-a-complaint-forms/ (last visited Jan. 30, 2026).

grievance in July 2025 but had received no response.

284.    Neither Defendant WORKERS UNITED nor Mr. Dempster ever responded to Plaintiff Gavrilova, or her grievance.

285.    Upon information and belief, Mr. Dempster and Defendant WORKERS UNITED performed little or no investigation regarding Plaintiff Gavrilova's grievance.

286.    Mr. Dempster and Defendant WORKERS UNITED failed to provide any information relating to Plaintiff Gavrilova's grievance.

287.    As a result of the issues Plaintiff Gavrilova filed a grievance over (loss of seniority) Plaintiff Gavrilova was required to end her employment with the OTG Defendants.

288.    Additionally, as a result of the loss of her seniority, Plaintiff Wooding was also unable to bid on and receive enough work shifts to continue working for the OTG Defendants and was required to seek employment elsewhere.

289.    Defendant WORKERS UNITED acted arbitrarily and without proper explanation given when it failed to examine and ignored the meritorious grievance filed by Plaintiff Gavrilova.

290.    Defendant WORKERS UNITED acted arbitrarily and without proper explanation when it failed to respond to Plaintiff Gavrilova, investigate, and provide any information relating to her grievance.

291.    As set forth in Vaca v. Sipes, 386 U.S. 171, 177 (1967), "[i]t must be the duty of the representative organization to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."

292.    Further, "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion." Vaca v. Sipes, 386 U.S. at 191.

42

293.    Defendant WORKERS UNITED chose to devote no resources into investigating a grievance that involved actions by the OTG Defendants that were directly inconsistent with its collective bargaining agreement and resulted in a direct injury to Plaintiffs' exercise of their rights and employment status.

294.    Additionally, this behavior is defined as an unfair labor practice by a labor organization as stated in 29 U.S.C. § 158(b)(1)(A): "[i]t shall be [an] unfair labor practice for a labor organization or its agents to (1) restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title."

295.    Therefore, Defendant WORKERS UNITED had a duty to fairly represent its members, and by acting against members of its own union, by keeping Plaintiff Gavrilova from the full extent of the grievance process owed to them as employees, Defendant WORKERS UNITED actively restrained Plaintiff Gavrilova and other similarly situated employees in the exercise of their rights.

**TENTH CAUSE OF ACTION BY PLAINTIFF GAVRILOVA**
**NYS Exec. Law § 296 and NYC Admin. Code § 8-107 - Failure to Accommodate**

296.    Plaintiff Gavrilova repeats and realleges each and every prior allegation as set forth herein in this Complaint.

297.    At all times relevant hereto, the OTG Defendants were "employers" within the meaning of the NYSHRL and the NYCHRL.

298.    At all times relevant hereto, Plaintiff Gavrilova and the OTG Defendants had an "employee" and "employer" relationship within the meaning of the NYSHRL and NYCHRL.

299.    Plaintiff Gavrilova is of the Jewish faith and kept Shabbat, which required her to refrain from working from sunset on Friday through Saturday night.

300.    Plaintiff had a bona fide religious belief and was entitled to an accommodation.

301.    The OTG Defendants had notice of Plaintiff's Gavrilova's religious beliefs.

43

302.    Plaintiff Gavrilova was able to perform her job with a reasonable accommodation, as demonstrated by her over 12 years of employment with the OTG Defendants.

303.    On or around July 2025, when the OTG Defendants' schedule bidding system changed and she lost her seniority, Plaintiff Gavrilova was unable to bid on her previously regular shift days of Sundays, Mondays, and Thursdays.

304.    On or around mid-August 2025, Ms. Gavrilova had an in-person conversation with OTG Management Senior HR Business Partner, Ms. Rafick and Terminal Director Mr. Tiller, who told Ms. Gavrilova that the only way she could be accommodated is if she provided "a doctor's note for medical reasons."

305.    It is clear from Plaintiff Gavrilova's exchange with Ms. Rafick that the OTG Defendants were unaware of what constituted a religious accommodation.

306.    On August 22, 2025, Ms. Gavrilova followed up with Ms. Rafick via text, confirming that for her "days off for Shabbat" she would "need to provide a doctor's note." Ms. Gavrilova specifically asked for "Friday and Saturday off" for observance.

307.    In response, Ms. Rafick replied, that anyone who needs a "reasonable accommodation…must go through the process with MetLife," and that it is "based on medical needs." Ms. Rafick further instructed Ms. Gavrilova that a "[r]eligious accommodation is granted when an employee is scheduled to work and needs to step away to pray for a few minutes."

308.    Ms. Rafick did not engage in an interactive process at that juncture.

309.    Ms. Rafick did not advise Plaintiff Gavrilova regarding what steps she would need to effectuate or formalize a religious accommodation, rather than a medical condition.

310.    Instead, Ms. Rafick denied Plaintiff Gavrilova a religious accommodation and told her she could "step away and pray for a few minutes."

44

311.     An accommodation would not have caused undue hardship to the OTG Defendants.

312.     The OTG Defendants failed to make an accommodation for Plaintiff Gavrilova based on her religious beliefs.

313.     The OTG Defendants' conduct, as alleged herein, constituted unlawful failure to engage in an interactive process and provided a reasonable accommodation in violation of the NYSHRL and/or NYCHRL.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs, individually and on behalf of all others similarly situated, pray for the following relief:

a.  Certifying the New York Class in accordance with Fed. R. Civ. P. 23(b)(3) or (c)(4) with respect to the claims set forth above;

b.  Designating Plaintiffs Alexandra Gavrilova and Annemarie Wooding as Class Representatives;

c.  Designating Bell Law Group, PLLC as Class Counsel;

d.  Granting judgment in favor of Plaintiffs, FLSA Plaintiffs, and the New York Class, and against Defendants, and awarding the amount of unpaid and misappropriated tips, with liquidated damages;

e.  Awarding liquidated damages to Plaintiffs, FLSA Plaintiffs, and the New York Class

f.  Awarding all other available compensatory damages to Plaintiffs, FLSA Plaintiffs, and the New York Class, including, inter alia, all unpaid wages, lost interest owed, and liquidated and double damages by Defendants under the FLSA, NYLL, and NYWPTA;

g.  Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action;

h.  Awarding pre-judgment and post-judgment interest to Plaintiffs on these damages; and

i.  Awarding such further relief as this court deems just and proper.

Dated: New York, New York
February 6, 2026

Respectfully submitted,

BELL LAW GROUP, PLLC

By: _____

Chaya M. Gourarie, Esq.
Elisabeth A. Schiffbauer, Esq.
Bell Law Group, PLLC
116 Jackson Avenue
Syosset, New York 11791
T. 516-280-3008
CG@belllg.com
eschiffbauer@belllg.com
*Attorneys for Plaintiffs and Putative Class*

46